# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

BERNICE SILVERSMITH,
on behalf of herself and
HWEELDI SILVERSMITH,

      Plaintiffs,

      vs.                       No. 1:20-CV-00566 WJ/GJF

SHAWN MARTIN,
ARTHUR M. CRUZ,
CHRISTIAN ROMAN, AND
UNKNOWN PERSONS 1-100,

      Defendants.


## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment based on Qualified Immunity, filed February 4, 2021 (Doc. 31) (the "Motion"). The Motion seeks summary judgment on the grounds that Defendants are entitled to qualified immunity, as probable cause existed for the arrest of Plaintiff 1 (defined herein). Additionally, the Motion asserts that Plaintiff 2 (defined herein) was not arrested and his affidavit should be stricken for lack of competence. Plaintiffs' response to the Motion contends that the stop itself was racially motivated in violation of the Equal Protection Clause, Defendants had no probable cause to make an arrest as to both Plaintiffs and said arrests were in violation of the Fourth and Fourteenth Amendments. Having considered the parties' arguments, the applicable law and the record, including the video footage of the sobriety testing and arrest, the Court finds that the Motion is well-taken and should be **GRANTED**.

## UNDISPUTED MATERIAL FACTS

Plaintiffs in this case are Bernice Silversmith ("Plaintiff 1") and Hweeldi Silversmith ("Plaintiff 2") (together, "Plaintiffs"). Both Plaintiffs are enrolled members of the Navajo Nation. Doc. 1-8 at 2, ¶ 2. Plaintiff 1 is the adoptive mother of Plaintiff 2 and has cared for him since he was a child. *Id.*, ¶ 4. Plaintiff 2 is approximately 33 years old and disabled.[1] *Id.*, ¶ 3.

Defendants in this case are Shawn Martin, Arthur Cruz, and Christian Roman (collectively, "Defendants" or "Named Defendants"), as well as unnamed individuals who, through amendment of the Complaint, may be named as Defendants responsible for all or a portion of the alleged harm suffered by Plaintiff ("Unnamed Defendants"). Doc. 31 at 2-3, ¶¶ 5 & 6. Defendant Martin is a member of the Navajo Nation. Martin Affidavit, ¶ 3. Defendant Cruz is a member of the Acoma Pueblo tribe. Cruz Affidavit, ¶ 2. Defendant Roman's wife and children are members of the Navajo Nation. Roman Affidavit, ¶ 2. Another Officer on the scene but not named as a Defendant, Calvin Brown ("Officer Brown"), is a member of the Navajo Nation. Brown Affidavit, ¶ 1. At all times relevant to the Complaint in this case, Defendants were law enforcement officers employed by the New Mexico State Police ("NMSP"). Doc. 1-8 at 2, ¶ 5.

At approximately 2:20 a.m. on May 6, 2017, Plaintiff 1 was driving northbound on US Highway 491 in McKinley County with Plaintiff 2 as a passenger. Doc. 31 at 3, ¶ 2. Plaintiff 1 was stopped at a sobriety checkpoint where Defendants were stationed. *Id.*, ¶ 3; Martin Affidavit, ¶ 5. Every driver was stopped at the checkpoint. *Id.*, ¶ 5; Martin Affidavit, ¶ 7. Defendant Martin was the supervisor at the checkpoint. *Id.*, ¶ 4; Martin Affidavit, ¶ 5.

---

[1] Plaintiff 2 has been diagnosed with Fetal Alcohol Syndrome and is unable to manage his own affairs or function independently as an adult. Doc. 1-8 at 2, ¶ 3.

After approaching the vehicle and observing Plaintiff 1, Defendant Cruz initiated a DWI investigation and requested that Plaintiff 1 undergo a series of standard sobriety tests. *Id*. at 4, ¶ 10-11; Cruz Affidavit, ¶ 13. Following the sobriety tests, Plaintiff 1 was detained and transported to the NMSP station, *id*., ¶ 13-14; Cruz Affidavit, ¶ 21, and Plaintiff 2 was escorted to a family member's home, Doc. 31 at 6, ¶ 32. On the way to the NMSP station, Plaintiff 1 "nod[ded] off" in the back of the police vehicle. Plaintiff 1 Affidavit, ¶ 9; Cruz Affidavit, ¶ 22.

At the NMSP station, Plaintiff 1 underwent two breathalyzer tests,[2] a Drug Recognition Evaluation ("DRE") and further sobriety testing—the "walk and turn, one legged stand, and finger to nose tests." Doc. 31 at 4, ¶ 14, 16, 20; Roman Affidavit, ¶ 4, 9. Results for both breathalyzer tests showed a 0.00% alcohol level. *Id*., ¶ 15; Cruz Affidavit, ¶ 23. Plaintiff 1 then signed a written consent form for a blood draw carried out at the hospital, and pending the results of such blood test, criminal charges were filed. *Id*. at 5, ¶ 22-23; Roman Affidavit, ¶ 15-16. The blood test results eventually showed no alcohol or detectable drug content, and the charges were dismissed on August 21, 2017. *Id*., ¶ 23; Roman Affidavit, ¶ 16.

## DISPUTED MATERIAL FACTS

Defendant Cruz alleges that he smelled an alcoholic odor coming from Plaintiff 1 at the traffic stop, and observed that she had "blood-shot watery eyes and she was somewhat incoherent." Cruz Affidavit, ¶ 11. Defendant Cruz asked Plaintiff 1 to undergo a field sobriety test, the results of which caused Defendant Cruz to "form[] a reasonable belief that [Plaintiff 1] failed the field sobriety test and could not safely operate a motor vehicle."[3] *Id*., ¶ 20.

---

[2] Plaintiff verbally consented to submit to a breath test at the station. Cruz Affidavit, ¶ 21.
[3] Defendant Cruz's affidavit contends that Plaintiff 1 failed the Horizontal Gaze Nystagmus test, the walk and turn test, and the one leg stand test. Cruz Affidavit, ¶ 17.

In the police station, Defendant Roman also smelled an odor of alcohol on Plaintiff 1 and observed "bloodshot and watery eyes." Roman Affidavit, ¶ 6. Following another sobriety test, Defendant Roman "had reasonable suspicion that [Plaintiff 1] was under the influence of depressants and was unable to operate a vehicle." *Id.*, ¶ 13. Plaintiff 1 told Defendant Roman that she "did not have any physical impairments, but she took medications for diabetes, allergies, pain pills, and supplements." *Id.*, ¶ 8.

Plaintiff 1 believes that Defendants Cruz and Roman could not have smelled alcohol because, she claims, "I do not drink alcohol and I don't smoke. I don't believe in drinking." Plaintiff 1 Affidavit, ¶ 1. Plaintiff 1 claims instead that she consumed one and a half cans of Red Bull.[4] *Id.*, ¶ 2. Further, Plaintiff 1 contends that she had "allergies," but "didn't have droopy eyes, bloodshot or watery eyes." *Id.*, ¶ 5. Plaintiff 1 also disagrees that Defendants Cruz and Roman formed a reasonable belief that she failed the sobriety tests, and claims, "I had on heels and was standing on gravel and I didn't stagger and lose my balance." *Id.*, ¶ 7.

Officer Brown was present at the checkpoint and claims to have recognized that Plaintiff 2 was disabled. Brown Affidavit, ¶ 9. Officer Brown also claims to have transported Plaintiff 2 to his aunt's home in Window Rock, Arizona following the detention of Plaintiff 1. *Id.*, ¶ 11, 22; *see also* Martin Affidavit, ¶ 11. Plaintiff 2 contends that Defendant Martin, not Officer Brown, drove him home from the checkpoint, Plaintiff 2 Affidavit, ¶ 3, and that he was breathalyzed, restrained with handcuffs, hit his head and sustained an injury on his leg when "pushed" into the "van" while his mother was being put into the police cruiser, *id.*, ¶¶ 4-5; Doc. 1-8 at 4, ¶ 13. Plaintiff 2 further alleges that Defendant Martin "told me that I would never see my mom again," claimed to be a

---

[4] The Court takes notice that Red Bull is an energy drink which does not contain alcohol. RED BULL ENERGY DRINK INGREDIENTS, Redbull.com (https://www.redbull.com/in-en/energydrink/red-bull-energy-drink-ingredients-list) (last accessed April 8, 2021).

"Peyote member," and made other comments which made Plaintiff 2 cry while in the vehicle. *Id.*, ¶ 6-7. Finally, Plaintiff 2 alleges that he was delivered to his step-sister's house, not his aunt's. *Id.*, ¶ 10.

## LEGAL STANDARD

### I.     Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Bridges v. Yeager*, 352 Fed. Appx. 255, 257 (10th Cir. 2009) (citing Fed. R. Civ. P. 56(c) (internal quotations omitted); *see Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582 (1998). "[P]laintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514, 91 L.Ed. 2d 202 (1986) (emphasis added). "To withstand a motion for summary judgment, a plaintiff in a §1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved *were motivated by a discriminatory purpose and their actions had a discriminatory effect*." *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) (emphasis added).

### II.     Qualified Immunity

"When [a] defendant seeks summary judgment on the basis of qualified immunity … the plaintiff bears the initial burden of proving that: (1) the officer's actions violated a constitutional right, and (2) this right was clearly established at the time of the conduct at issue." [5] *Amundsen v.*

---

[5] The Court need not make a determination on whether the rights allegedly violated by Defendants were clearly established, as both prongs of the qualified immunity analysis must be met and, as explained herein, Plaintiffs have failed under the first prong—establishing that their constitutional rights were violated.

*Jones*, 533 F.3d 1192, 1201 (10th Cir. 2008) (citing *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000)) (This special standard for qualified immunity is "based on the importance of resolving immunity questions at the earliest possible stage in litigation.") (internal quotations and citations omitted). A plaintiff's failure to meet either burden entitles the defendant to qualified immunity and a grant of summary judgment; however, if a plaintiff does meet this burden, then the defendant must demonstrate that there are no genuine issues of material fact under a summary judgment analysis. *Id*. at 1198.

"As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986). Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interests in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). The Harlow standard is specifically designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment," *Malley*, 475 U.S. at 341. Qualified Immunity, when applicable, includes "an entitlement not to stand trial or face the other burdens of litigation." *Behrens v. Pelletier*, 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

### III. Probable Cause

In this context, "an arrestee's constitutional rights were violated if the arresting officer acted in the absence of probable cause …" *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). Probable cause exists when an officer has sufficient information "to warrant a prudent man in believing that the [driver] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964). A defendant is entitled to qualified immunity

if there was "arguable probable cause" to make an arrest. *Id.* "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). "The proper inquiry in a § 1983 claim based on false arrest is not whether the person arrested actually committed an offense, but whether the arresting officer had probable cause to believe that he had." *Crawford ex. rel. Crawford v. Kansas City, Kansas*, 952 F. Supp. 1467, 1474 (D. Kan. 1997) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)).

## DISCUSSION

Plaintiffs bring the subject Complaint against Defendants pursuant to the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, claiming racial profiling and unlawful search and seizure in violation of the Fourth and Fourteenth Amendments.[6] Plaintiffs specifically allege that (1) assumptions about Native Americans, namely that they are commonly "drunk," motivated the stop and detention of Plaintiff 1 at the checkpoint, (2) Defendants improperly arrested Plaintiff 1, charged Plaintiff 1 with a crime, and insisted on a warrantless blood test, and (3) Defendants arrested Plaintiff 2 without probable cause. Plaintiffs offer no evidence beyond their own allegations in the record; however, it is undisputed that Plaintiff 1, the driver of the vehicle, was, in fact, not intoxicated by alcohol or detectable medication at the time of the arrest, as both her breathalyzer and toxicology tests yielded negative results.

In response to the Complaint, Defendants assert qualified immunity, contending that because Defendant (1) smelled of alcohol, (2) admitted to drinking alcohol an hour before the arrest, (3) had "bloodshot watery eyes," and (4) failed multiple field sobriety tests, probable cause

---

[6] Plaintiffs also elude to the use of "excessive force" when Plaintiff 2 was taken home after his mother's arrest, but the Complaint does not sufficiently allege an excessive force cause of action and refers to no authority on the issue. *See* Doc. 1-8 at 7, ¶ 23.

existed to make the arrest. *See State v. Granillo-Macias*, 2008-NMCA-021, ¶ 12, 143 N.M. 455, 176 P.3d 1187 (holding that an odor of alcohol emanating from the defendant, his lack of balance at the vehicle, and his failure to satisfactorily perform field sobriety tests supported an objectively reasonable belief that the defendant had been driving while intoxicated, and thus constituted probable cause to arrest). Defendants offer corroborated affidavits undermining several of Plaintiffs' allegations, and the dash cam footage containing Plaintiff 1's conversation with Defendant Cruz, field sobriety test and transportation to the police station reveals that numerous claims set forth in Plaintiffs' affidavits are patently untrue.

I.    **Plaintiffs fail to provide any basis for a racial profiling cause of action.**

As a preliminary matter, the Court notes that Plaintiffs' claim as to discrimination under the Equal Protection Clause of the Fourteenth Amendment are founded on completely unsupported notions of racial prejudice. Under such a claim, a plaintiff "must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *Marshall*, 345 F.3d at 1168. Neither Plaintiff here, however, offers any such evidence beyond the Complaint's allegation that Defendants "unfairly applied racial profiling to Plaintiffs, who are both enrolled members of the Navajo tribe." Doc. 1-8, ¶ 21. Plaintiffs' affidavits, the only items offered in support of their position, do not elude to racial discrimination and completely fail to refute the fact that every driver, regardless of race, was stopped, checked and treated the same in circumstances where probable cause existed to presume the driver was unable to safely operate a vehicle. Moreover, these affidavits fail to refute or respond to the fact that all of the Named Defendants are Native American or married to a Native American with Native American children, with most of them being enrolled members of the Navajo Nation, the very same tribe as Plaintiffs. *See Murray v. City*

*of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (affidavits presented to show dissimilar treatment did not provide any factual bases for inference that others were treated differently).

Though underlying discrimination allegations bleed into all of Plaintiffs' other claims as to unreasonable search and seizure, the Court finds that there is no evidentiary basis for Plaintiffs' cause of action brought under the Equal Protection Clause. The Court accordingly grants Defendants' Motion as to these claims, *see* Doc. 1-8 at 6, ¶ 21, and turns to the substantive claims of unlawful search and seizure.

## II. Plaintiff 1 has not demonstrated that her rights were violated.

The central issue before the Court as to Plaintiff 1 is whether Plaintiff 1 has proven that Defendants violated her constitutional right against unlawful search and seizure. If this is established, then the Court must determine whether any issue of material fact exists barring Defendants' entitlement to summary judgment—in other words, "whether the evidence presents a sufficient disagreement to require submission to a jury," or whether the evidence is "so one-sided that one party must prevail as a matter of law" when viewed in a light most favorable to Plaintiff 1. *Shero v. City of Grove,* 510 F.3d 1196, 1200 (10th Cir.2007) (quotation omitted). As explained below, Plaintiff 1 has not met her burden, and even if she did, Defendants have shown that no genuine issue of material fact exists undermining their entitlement to summary judgment.

### A. False Statements in Plaintiff 1's Affidavit

Plaintiffs' response to the Motion refers to *Scott v. Harris*, 550 U.S. 372 (2007). Plaintiffs specifically appeal to the following language: "In evaluating a motion for summary judgment based on qualified immunity, we take the facts in the light most favorable to the party asserting the injury … [T]his usually means adopting … the plaintiff's version of the facts" unless that version "*is so utterly discredited by the record that no reasonable jury could have believed him,*"

*Id.*, at 378, 380 (internal quotations and citations omitted) (emphasis added). Of course, in *Scott*, the "record" which so "utterly discredited" the plaintiff's version of the facts was video evidence. *See id.*, at 380-381 (finding that because video evidence discredited the plaintiff's allegations, the Court of Appeals erred in relying on the plaintiff's "visible fiction" as opposed to viewing the facts in the light depicted by the videotape). Plaintiffs even contend, apparently citing *Rhoads v. Miller* as analogous, that "[i]n *Scott*, the plaintiff's testimony was discredited by a video tape … Here, there is no videotape or similar evidence in the record to blatantly contradict … testimony." Doc. 37 at 10 (citing 352 F. App'x 289, 291-92 (10th Cir. 2009)). It is a mystery that Plaintiffs' made this argument, as it appears from the record that that dash cam footage from the night in question was provided to Plaintiffs' counsel around February 18, 2021. *See* Doc. 38-1. Nonetheless, on March 15, Plaintiffs filed their Response including this language. The Court must wonder if Plaintiffs' counsel ever reviewed the footage, as a reading of the Response would leave anyone with the impression that no footage existed or that Plaintiffs merely chose to ignore its important contents entirely.

Nevertheless, the Court has reviewed the dash cam footage,[7] and just as in *Scott*, such footage "utterly discredit[s]" Plaintiff 1's claims. *See id.*; *see also* Doc. 37 at 10. The Court notes the following blatant misstatements set forth in Plaintiff 1's sworn affidavit:

1. Affidavit: "I do not drink alcohol and I don't smoke. I don't believe in drinking. I did not consume any alcoholic beverages on May 5, 2017." Plaintiff 1 Affidavit, ¶ 1. "I did not state that I had one alcoholic beverage." *Id.*, ¶ 4.

   Video: Defendant Cruz asks Plaintiff 1 after some inaudible conversation: "so you just left the bar and you had one beer, a Corona?" Plaintiff responds with an understanding and affirmative nod, and when asked how long ago she drank the

---

[7] Defendants draw the Court's attention to the dash cam footage via an interpretive affidavit pursuant to *Stevens v. Water Dist. One of Johnson Cty.*, 561 F. Supp. 2d 1224, 1232 (D. Kan. 2008) ("Where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues.") (citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996)) (quotation omitted). The Court takes notice of the dash cam footage itself, as it is important to understanding the events of the night in question and inseparable from Plaintiffs' argument (though Plaintiffs imply in their response that the video does not exist).

beer, she responds: "about an hour ago." Supplemental Cruz Affidavit, ¶ 4; Front Camera Video, Attachment A, at 1:25. When in the back of the police vehicle, Plaintiff also states: "He [Plaintiff 2] wanted to come and dance and I just had one bottle and that was it." *Id.*, ¶ 12; Rear Camera Video, Attachment B, at 18:22. It also appears that Plaintiff 1 throws a cigarette butt to the ground while speaking with Defendant Cruz. Front Camera Video, Attachment A, at 1:27.

2. Affidavit: "I had on heels and was standing on gravel . . ." (referring to her failure of the sobriety test). Plaintiff 1 Affidavit, ¶ 7.

    Video: Plaintiff 1 is clearly not wearing heels, and furthermore, is standing on even, paved road. *See* Front Camera Video, Attachment A, at 1:44.

3. Affidavit: "I didn't stagger and lose my balance." Plaintiff 1 Affidavit, ¶ 7.

    Video: Plaintiff 1 stumbles several times, removing her arms from her sides for balance, failing to place her feet directly in front of one another as she walked, and placing her foot down for support and halting during the heel to toe test. *See* Front Camera Video, Attachment A, at 3:32 to 4:08.

    B.  The Arrest of Plaintiff 1

Based on the dash cam footage, nearly every of Plaintiff 1's contentions are not just undermined, but rendered wholly untrue. *See Scott*, 550 U.S. at 379-380 (in considering deputy's motion for summary judgment, courts had to view the facts in the light depicted by videotape); *see also Conner v. Rodriquez*, 891 F. Supp. 2d 1228, 1230 (D.N.M. 2011) (court did not give credibility to plaintiff's assertion that he was lying passively and unconscious across seat of his vehicle where video and audio evidence clearly contradicted that assertion). It is apparent that there was a valid basis for Defendant Cruz's reasonable belief that Plaintiff 1 was impaired; Plaintiff 1 was not able to perform the tasks required in the sobriety test, she admitted to drinking one alcoholic beverage and recently left a bar (which substantiates the claims that she smelled of alcohol), and she "nodded off" in the back of the police vehicle on the way to the station. *See* Plaintiff 1 Affidavit, ¶ 9. Plaintiff 1 relied on her own affidavit as evidence for the alleged misconduct, but such affidavit is conclusory and entirely unsupported. *Delange v. Dutra Const.*

*Co.*, 183 F.3d 916, 921 (9th Cir. 1999) (Where the nonmoving party relies only on his own affidavit to oppose summary judgment, "[he] cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.") (citing *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

For these reasons, the Court finds that Plaintiff 1 smelled of alcohol and failed the sobriety test, and that Defendants' therefore had probable cause to make the arrest. Defendants are thus protected by qualified immunity as to Plaintiff 1's claims alleging that the sobriety testing and arrest constitute a violation of the Fourth and Fourteenth Amendments, and even absent qualified immunity, there is no *genuine* issue of material fact and thus, Defendants are entitled to summary judgment as a matter of law. *See Bridges*, 352 Fed. Appx. at 257.

C. The Blood Test

Plaintiff 1's last remaining claim is that the blood draw for toxicology testing was unwarranted and therefore an unreasonable search and seizure because breathalyzer testing administered by the police revealed 0.00% alcohol in Plaintiff 1's system. This claim fails because Defendants had probable cause to infer that Plaintiff 1 was intoxicated, and because Plaintiff 1 consented to the blood draw.

As Defendant Roman stated in his affidavit: "I had reasonable suspicion that Ms. Silversmith was under the influence of *depressants* and was unable to operate a vehicle." Roman Affidavit at 2, ¶ 13 (emphasis added). It seems clear that Defendants in this case were aware that either (1) the breathalyzer results were flawed, or (2) Plaintiff 1 was not, in fact, drunk on alcohol. Nonetheless, the smell of alcohol, her behavior, and her failing of the sobriety tests understandably caused Defendants to form a reasonable suspicion that she was under the influence of some

substance, alcohol or otherwise, and unable to operate a vehicle. *See Gallegos v. Vernier*,[8] 2019-NMCA-020, 458 P.3d 533, 540 (Ct. App. 2018) ("In New Mexico, it is a crime for a person to drive a vehicle while under the influence of *either* 'intoxicating liquor' or 'any drug to a degree that renders the person incapable of safely driving a vehicle.'") (quoting NMSA 1978, § 66-8-102(A), (B) (2016)) (emphasis in original). As a result, Defendants obtained consent from Plaintiff 1 to undergo the blood test, consent which further undermines Plaintiff 1's position on this claim.

A law enforcement officer ordering a blood test is often held to a higher standard than an officer merely making an arrest. This is because probable cause is not enough, on its own, to warrant a blood test absent "exigent circumstances sufficient to justify it." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1172 (10th Cir. 2003) (A blood test requires both "probable cause *and* exigent circumstances . . .") (emphasis in original). However, a determination on the presence of exigent circumstances is not necessary where consent was given for the blood test. *Amundsen*, 533 F.3d at 1201 (reversing denial of summary judgment based on qualified immunity when the plaintiff consented to the blood test, stating "a blood test conducted pursuant to valid consent does not violate the Fourth Amendment."); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1207 (10th Cir.

---

[8] While not controlling on this matter, *Gallegos* is remarkably similar to the instant case. Debra Gallegos, the plaintiff, was stopped at a DWI checkpoint, reportedly smelled of alcohol, and had "bloodshot, watery eyes." *Id*. at 536. She denied drinking, but said she had a drink the night before and informed the defendant-officer that she had allergies. *Id*. She agreed to a field sobriety test, and when she failed such test, she was taken to the police station and submitted to two breathalyzer tests, both of which showed an alcohol content of 0.00%. *Id*. She was then transported to the hospital to have her blood drawn for toxicology testing, was charged with DWI pending the results of the blood test, and the charges were dropped when the blood test came back negative. *Id*. at 536-37. The court found that the defendants had probable cause to make the arrest and that the detention and testing in the police station was not a constitutional violation; however, the court also found that the blood draw was, in fact, a violation of the Gallegos' Fourth Amendment right. *See, generally, id.* This latter finding was based entirely on the fact that Gallegos **did not** consent to the blood draw. Here, Plaintiff 1 did consent, marking the only real factual distinction between the instant case and *Gallegos*.

2003) (both finding that when consent is given for a blood test, the Fourth Amendment is not violated). Here, Plaintiff 1 signed a valid written consent to the blood test ordered by Defendant Cruz, and the test therefore raises no constitutional issue. *See* Cruz Affidavit, ¶ 26 ("Ms. Silversmith signed a written consent for the blood draw and samples were taken."); Roman Affidavit, ¶ 15 ("Ms. Silversmith signed the consent form for a blood draw, and this was done [at] the hospital."); Plaintiff 1 Affidavit, ¶ 11 ("I did sign a written consent for the blood draw . . ."); *see also Amundsen*, 533 F.3d at 1201 ("Because [the plaintiff] consented to the toxicology exams, she failed to establish that her Fourth Amendment rights were violated.").

Plaintiff 1 alleges that she was coerced to consent to the blood draw because she "was scared and felt pushed into doing what [she] was told." Plaintiff 1 Affidavit, ¶ 11. The Court does not accept this claim for three reasons: (1) Plaintiff 1's claims are vague and conclusory and do not alert the Court to any specific factual actions taken by Defendants which could remotely constitute coercion, *see Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ("nonmovant's affidavits must be based upon personal knowledge *and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient*") (emphasis added); (2) Plaintiff 1 has, thus far, not been truthful as to nearly every other claim which could conceivably create a factual dispute, and no reasonable jury would rule in her favor on this issue; and (3) corroborated affidavits and Plaintiff 1's own admission clearly establishes that she consented to the blood test, and Plaintiff 1 provides no authority to support her proposition that fear during an arrest constitutes undue coercion sufficient to undermine consent, *see Amundsen*, 533 F.3d at 1201 ("Although [the plaintiff] argues on appeal that her consent was not voluntary, she has not carried her burden of showing she consented as a result of police coercion."); *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007) (rejecting similar claim for lack of "reasoned argument").

The Court therefore finds that Defendants had probable cause to believe that Plaintiff 1 was under the effect of some substance and was incapable of safely driving a vehicle. Plaintiff 1 has failed to demonstrate that any of the Defendants violated her rights under the Fourth or Fourteenth Amendments. Accordingly, Defendants are entitled to summary judgment based on qualified immunity as to all of Plaintiff 1's claims.

### III.    Plaintiff 2 was not arrested.

As before, the Court's analysis as to Plaintiff 2 centers around whether Plaintiff 2 can demonstrate that he was unlawfully searched or seized in violation of his constitutionally sanctified protections. Plaintiff 2's affidavit makes allegations similar in nature to those made by Plaintiff 1—that is, allegations set forth only in an affidavit without any other support on the record.

#### A.    Plaintiff 2's Material Allegations

Initially, the Court notes that the Complaint and Plaintiff 2's affidavit contain two types of allegations: (1) material allegations, which have a material bearing on Plaintiff 2's position that his constitutional protections against unreasonable search and seizure were violated, and (2) miscellaneous allegations, which are either conclusory in nature or insufficient to prove that Plaintiff 2's rights were violated. This section addresses Plaintiff 2's material allegations, all of which are undermined by video evidence.

Plaintiff 2's material allegations are, in order, that (1) Plaintiff 2 was handcuffed, Doc. 1-8 at 4, ¶ 12, (2) Plaintiff 2 was given a breathalyzer, *id*., and (3) Plaintiff 2 was forced into a police car, and hit his head and injured his leg when he hit the car's door frame, *id*.

The Complaint establishes the timeline for these allegations, and this is important to note because the Complaint claims that Plaintiff 2 was treated in a hostile manner and handcuffed, **then** given a breathalyzer test, **then** patted down, and **then** put into the police car. *See id*; *see also*

Plaintiff 2 Affidavit, ¶ 5. The Complaint also alleges that "**[w]hile** [Plaintiff 2] was being removed from the scene, Defendant Cruz placed Silversmith under arrest, handcuffed her and placed her in the patrol unit." *Id.*, ¶ 13 (emphasis added). The only interpretation of these material allegations is that the bulk of Plaintiff 2's claims—the breathalyzer, the handcuffing, the patting, the "pushing" into the police vehicle and the alleged injuries from the push—took place either before or simultaneous to *Plaintiff 1*'s arrest, handcuffing, and placement in the other police vehicle.

The video footage, however, destroys this "visible fiction." *Scott*, 550 U.S. at 381. The footage inside the other police vehicle, taken *after* Plaintiff 1 was arrested, handcuffed and placed in the vehicle, briefly shows Plaintiff 2 standing next to the police talking with the officer and Plaintiff 1. Indeed, Plaintiff 1 had been under arrest and in the police car for approximately 17 minutes. Plaintiff 2 has a relaxed demeanor at this time, and is not handcuffed, but rather, has his hands in his jacket pockets. Rear Camera Video, Attachment B, at 17:15-18:07. Plaintiff 1 nods at Plaintiff 2, clearly acknowledging by the conversation that the individual is Plaintiff 2, *id.*, at 18:03, and gives the officer directions to the home to which Plaintiff 2 was later taken, *id.*, at 17:15-18:07. The allegations as set forth in the Complaint are thus patently incorrect as to Plaintiff 2's so-called arrest, and the allegations in Plaintiff 2's affidavit are entirely inconsistent.

Accordingly, the Court finds that because (1) the Complaint and affidavit allege that Plaintiff 2 was handcuffed, breathalyzed, put into a police van and injured in the process prior to or during Plaintiff 1's arrest and placement into the other police cruiser, and (2) the series of events is demonstrably impossible based on video footage, the material allegations fail to establish a constitutional violation and are stricken under *Connor*. *See Conner*, 891 F. Supp. 2d at 1230 (no credibility given to plaintiff's assertions where video evidence contradicted assertions); *see also Scott*, 550 U.S. at 379-380 (courts to view the facts in the light depicted by videotape). It would

be absurd to infer any truth to these allegations when the underlying narrative, as to both Plaintiffs, has been contradicted to this degree, and when Plaintiffs have failed to allege any facts in a way that is consistent with the video footage or record in this case.

   B. <u>Plaintiff 2's Miscellaneous Allegations</u>

Plaintiff 2 makes other allegations which are insufficient, even taken as true, to support his claim of unreasonable search and seizure under § 1983. These miscellaneous allegations are set forth in the Complaint as follows: Defendant Martin told Plaintiff 2 that his mother was going to "the Big House" and that he would never see her again. Doc. 1-8 at 4, ¶ 12. Defendant Martin then drove Plaintiff 2 to Plaintiff 2's sister's house in Window Rock (Arizona), during which Defendant "was verbally abusive." *Id*. When Plaintiff 2 arrived at his sister's house, he cried. *Id*.

The affidavit contains similar allegations; in addition to those facts alleged in the Complaint, the affidavit states: Defendant Martin questioned Plaintiff 2 on the number of drinks Plaintiff 1 had, and what kind of drinks. *Id*., ¶ 6. "He was really mean to me and made me cry." *Id*., ¶ 7. Defendant Martin said Plaintiffs were drunks. *Id*. He said he was a "Peyote member."[9] *Id*.[10]

---

[9] It appears that "Peyote member" refers to a member of the Native American Church (NAC), also known as Peyotism and Peyote Religion. NATIVE AMERICAN CHURCH, NORTH AMERICAN RELIGION, Encyclopaedia Britannica (last updated April 21, 2019) (https://www.britannica.com/topic/Native-American-Church/additional-info#history) (last accessed April 9, 2021).

[10] There are also factual allegations, such as claims concerning eye-glasses and the owner of the house, which are completely immaterial and appear to be set forth in response to Defendants' Motion for purposes of creating factual disputes. See *id*., ¶ 11. These allegations have no bearing on whether Plaintiff 2 was unlawfully searched and seized, and are thereby disregarded in the Court's analysis. Plaintiff also alleges that the officer who drove him home threatened to tighten his handcuffs. Plaintiff 2 Affidavit, ¶ 5. The Court has already found that the video evidence refutes the fact the he was handcuffed at all, as alleged in the Complaint. And even he was, Plaintiff 2 has not established that Defendants lacked probable to detain him temporarily for purposes of safely taking him to the home.

At the outset, it must be noted that not a single of the above claims is supported in the record, and corroborated officer affidavits, including the affidavit of Officer Brown, not a Named Defendant in this case, refute them further. Not even the identity of the officer who drove Plaintiff 2 home is correct. *See* Brown Affidavit, ¶ 11 (stating that because he was from the same town as Plaintiff 2's relative and had a disabled sister, he was asked to take Plaintiff 2 home); *see also* Martin Affidavit, ¶ 11. Moreover, these allegations of "verbal abuse" are not probative of the issue of whether Plaintiff 2 was arrested. They may lend to an excessive force cause of action,[11] but their unrealistic nature, in light of evidence significantly discrediting both of Plaintiffs' affidavits, and the fact that Plaintiffs failed to properly plead an excessive force claim, make them irrelevant to Plaintiff 2's burden. Indeed, taken as true, none of the miscellaneous allegations in Plaintiff 2's affidavit or the Complaint are sufficient for Plaintiff 2 to establish that a constitutional right was violated.

### C. No Arrest

Taken together, all of the facts alleged in the Complaint and Plaintiff 2's affidavit are either refuted by video evidence or insufficient to form a factual dispute capable of defeating the Motion. In light of Defendants' invocation of qualified immunity, Plaintiff 2 must show that his rights were violated. Ordinarily, this would mean showing that the officers lacked probable cause for an arrest, but here, Plaintiff 2 has not even shown that an arrest occurred. The reality as set forth in the form of overwhelming evidence is that Plaintiff 2 was not arrested, but rather, taken home as a courtesy in light of his disability and the unfortunate situation involving Plaintiff 1. Plaintiffs argue that the

---

[11] It should be noted that none of the allegations rise to the level of excessive force, and Plaintiffs have made no arguments as to the "objectively reasonable" standard applicable to excessive force claims brought under the Fourth Amendment (the applicable constitutional amendment for excessive force claims where a defendant alleges arrest without a warrant before a probable cause determination). *See McCowan v. Morales*, 945 F.3d 1276, 1283 (10th Cir. 2019).

transportation of Plaintiff 2 was an arrest, and Plaintiffs allege self-serving facts which could bring the conduct of the Defendants into constitutional question. However, such allegations lack any support, contradict corroborated affidavits, and do not demonstrate that any officer subjected Plaintiff 2 to an unlawful search and seizure. *See Martinez v. United States DOE*, 170 Fed. Appx. 517, 523 (10th Cir. 2006) ("we find Mr. Martinez's self-serving affidavit, without other supporting evidence, unpersuasive"); *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004) (affidavit which included assertions that were not supported in record and did not demonstrate corroborating evidence were insufficient for summary judgment purposes). This alone justifies Defendants' qualified immunity as to Plaintiff 2, but the Court also considered a significant flaw with the affidavit in coming to its conclusion.

This flaw is the likelihood that the contents of Plaintiff 2's affidavit are not based on personal knowledge and that Plaintiff 2 is not competent to testify. *See Hall*, 935 F.2d at 1111 (to survive summary judgment, a non-movant's affidavit must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient). The Court recognizes that the record suggests Plaintiff 2's disability is severe and that his affidavit was written, at least in significant part, by Plaintiff 1, which calls into question whether the drafter of the affidavit actually had personal knowledge as to the conduct therein described. Plaintiff 2 Affidavit, ¶ 1 ("I am disabled and my mother Bernice Silversmith helped me with this affidavit."). Though the Motion is granted due to the video footage undermining Plaintiffs' factual allegations, the Court finds also that the affidavit concerning Plaintiff 2 should be stricken as it lacks the requirements of personal knowledge and competence *which the affidavit must show* for such affidavit to be used to survive summary judgment. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal

knowledge, set out facts that would be admissible in evidence, and *show* that the affiant or declarant is competent to testify on the matters stated") (emphasis added); *see also United States v. Odom*, 736 F.2d 104, 112 (4th Cir. 1984) (A witness may be disqualified under Rule 601 . . . [if] he does not have the capacity to recall, or . . . does not understand the duty to testify truthfully.").

For these reasons, the Court finds that Plaintiff 2 has failed to demonstrate that his rights were violated under § 1983 and the burdens attendant to Defendants' assertion of qualified immunity. Furthermore, Defendants have shown that no *genuine* issue of material fact exists under a summary judgment analysis as to Plaintiff 2.

## CONCLUSION

While Plaintiffs have attempted to create factual disputes between their accounts of the night in question and the accounts of Defendants, such disputes have been defeated by video evidence or are irrelevant to Plaintiffs' burden of establishing the violation of a constitutional right. Even under a bare summary judgment analysis, Defendants prevail, as Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts" and "[w]here the record *taken as a whole* could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis added) (internal quotations omitted). "Taken as a whole," the supposed facts set forth in Plaintiffs' Complaint and affidavits are cast in the shadow of a series of lies revealed by video footage, and are representative of the type of litigation for which qualified immunity exists.

For these reasons, and those otherwise explained in this Memorandum and Order, Plaintiffs have failed to allege facts supporting a claim of racial profiling and have failed to demonstrate a

violation of their rights under the Fourth or Fourteenth Amendments. Defendants are therefore entitled to qualified immunity, and the Court hereby **GRANTS** the Motion for Summary Judgment based on Qualified Immunity.

   **IT IS SO ORDERED.**

                                      _____
                                      WILLIAM P. JOHNSON
                                      CHIEF UNITED STATES DISTRICT JUDGE